IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| PROACTIVE CLINICAL PARTNERS, PC,<br>8455 Keystone Crossing, Suite 300<br>Indianapolis, IN 46240<br><br>Plaintiff,<br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services<br>200 Independence Ave. S.W.<br>Washington, DC 20201<br><br>Defendant. | Civil Action No. 1:26-cv-1930 |

**COMPLAINT FOR JUDICIAL REVIEW**

Plaintiff, Proactive Clinical Partners, PC ("Proactive" or "Plaintiff") brings this Complaint for Judicial Review against Defendant Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of Health and Human Services ("Secretary" or "Defendant"), for violations of law in the design and execution of the statistical sampling and the calculation of an alleged extrapolated overpayment amount, plus interest, on claims submitted to Medicare, for the audit review period from May 15, 2020 through April 22, 2024 (the "Review Period"), and asserts as follows:

## I. PARTIES

1. Plaintiff Proactive is an Indiana professional corporation that offers a comprehensive range of skilled nursing home/facility evaluation and management ("E/M") services to Indiana residents, with its principal place of business at 8455 Keystone Crossing Suite 300, Indianapolis, IN 46240.

2. Plaintiff has completed all necessary requirements to be a Medicare supplier. *See* 42 C.F.R. § 400.202. ("Supplier means a physician or other practitioner, or an entity other than a provider, that furnishes health care service under Medicare").

3. At all times relevant to this Complaint, Plaintiff was enrolled in the Medicare program pursuant to a Medicare Enrollment Application submitted to the Centers for Medicare and Medicaid Services ("CMS").

4. For the relevant Review Period, Plaintiff provided services to Medicare beneficiaries and submitted claims for reimbursement that later formed the basis for CMS's alleged overpayment demand.

5. Defendant, Robert F. Kennedy, Jr., is named in his official capacity as the Secretary of the United States Department of Health and Human Services ("HHS"). The Secretary's responsibilities include implementing and administering the Medicare program under Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 *et seq*.

6. The Secretary administers the Medicare program through CMS, which is a division of HHS that reimburses enrolled Medicare suppliers for medically necessary services that are provided to Medicare beneficiaries. *Id.*

7. CMS also oversees and directs contractors (*see infra* Sections III.B and III.C), who act as agents of CMS to administer claims, conduct audits, and handle the first two levels of administrative review when a Medicare supplier appeals the denial of any Medicare claim.

8. The Office of Medicare Hearings and Appeals ("OMHA") conducts the third level of administrative review in the Medicare claims appeal process and operates separately from the other contractors involved in the appeal process.

9. The Medicare Appeals Council ("Council")—a component of the Departmental Appeals Board ("DAB") within HHS—provides the fourth level of administrative review.

10. All references to the Secretary herein are intended to include CMS, its agent contractors, and any of their successors or predecessors.

## II. JURISDICTION AND VENUE

11. This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Fifth and Fourteenth Amendments of the United States Constitution.

12. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) as applied to Medicare appeals by 42 U.S.C. § 1395ff, which authorizes judicial review of factual findings in a final agency decision of the Secretary, and pursuant to 5 U.S.C. §§ 704, 706, which authorizes judicial review of final agency decisions for "all relevant questions of law…."

13. Plaintiff has exhausted its administrative remedies. Plaintiff is filing suit after receiving a fully unfavorable Administrative Law Judge ("ALJ") Decision from OMHA on March 24, 2026, affirming the Secretary's contractors' extrapolated overpayment determination, timely seeking Council review, and, after the Council failed to issue a timely decision, obtaining an order granting escalation to federal district court.

14. Under the APA and 42 U.S.C. § 405(g), Courts will review agency action only after a final agency decision. 5 U.S.C. § 706. Agency action is final when two conditions are met: (1) the agency action marks the "consummation" of the agency decision-making process, and (2) the action is one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Dhakal v. Sessions,* 895 F.3d 532, 539 (7th Cir. 2018) (quoting *Bennett*

*v. Spear,* 520 U.S. 154, 177-78 (1997)); *see also Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs,* 335 F.3d 607, 614 (7th Cir. 2003).

15. Courts have held that where plaintiffs have bypassed the Council in following the prescribed rules at 42 C.F.R. § 405.1132(a)–(b), "the [ALJ's] opinion stands as the final decision of the Secretary" and "[j]udicial review of such final decisions lies with [a federal court] pursuant to 42 U.S.C. § 1395ff(b)(1)(A), which incorporates 42 U.S.C. § 405(g) and allows for judicial review of a final decision of the Secretary with respect to Medicare benefits." *Prime Healthcare Servs.—Montclair, LLC v. Hargan*, No. 17-cv-659, 2018 WL 333862, at *5 (C.D. Cal. 2018).

16. The amount-in-controversy is greater than $1,960 as required by 42 U.S.C. §§ 1395ff(b)(1)(E)(i) and 1395ff(b)(1)(E)(iii).

17. This suit is timely filed within sixty (60) days of the date that Council granted Plaintiff's request for escalation to federal court, as prescribed by the rules governing escalation. *See* 42 C.F.R. § 405.1132(b); *see also* 42 C.F.R. §§ 405.1006(c), 1136(a)(1).

18. Venue is proper in this Court as Plaintiff's principal place of business is located in this District. 42 U.S.C. § 405(g); 42 U.S.C. § 1395ff(b)(1)(A).

## III. LEGAL BACKGROUND

### A. Medicare Program

19. Congress enacted the Medicare Program in 1965 under Title XVIII of the Social Security Act to provide health insurance primarily to individuals sixty-five years of age and older, disabled persons, and those with end-stage renal disease. Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C. §§ 1395-1396v).

20. The Medicare Program seeks to ensure that its beneficiaries have access to health care services. *Id.*

21. The Medicare Program is made up of four separate parts—Part A, Part B, Part C, and Part D. 42 U.S.C. § 1395 *et seq*.

22. As relevant to this matter, Medicare Part B refers to the supplementary medical insurance program authorized under Part B of Title XVIII of the Social Security Act. 42 U.S.C. § 1395k(a)(1); 42 C.F.R. § 400.202. Part B supplements Part A by covering other medical services enumerated at 42 U.S.C. §§ 1395k and 1395x.

23. Providers and suppliers enroll in the Medicare Program by completing an enrollment application and undergoing a certification process to verify their licensing and other credentials.

24. Providers and suppliers enroll with the Medicare Administrative Contractor ("MAC") for CMS to administer claims for the Medicare benefit category applicable to the provider or supplier's covered services for the geographic locale in which the provider is physically located. 42 C.F.R. § 421.404(b)(1), (c)(1).

25. Under Medicare Part B, beneficiaries pay a monthly premium to receive coverage for the various forms of supplementary medical services that are enumerated at 42 U.S.C. § 1395x.

26. The Seventh Circuit has recognized that providers have a property interest in Medicare reimbursements for services rendered to beneficiaries. *Rock River Health Care, LLC v. Eagleson,* 14 F.4th 768, 776 (7th Cir. 2021).

27. Medicare providers and suppliers are statutorily entitled to reimbursement for services rendered to Medicare Part B beneficiaries under 42 U.S.C. § 1395l.

28. In practice, when medical providers and suppliers, such as Proactive, furnish services to a Medicare Part B beneficiary, the providers or suppliers thereafter submit a claim for

reimbursement based on the beneficiary's assignment of their property interest to the provider or supplier. Medicare Claims Processing Manual ("MCPM") Ch. 1, § 30.2.

29. Providers and suppliers submit these claims for reimbursement to a MAC. 42 U.S.C. § 1395ff(a)(2)(A). MACs are the government contractors responsible for processing Medicare claims and making payments. 42 U.S.C. § 1395kk-1(a)(3).

**B. Post-Payment Reviews Conducted by Unified Program Integrity Contractors**

30. Under the Medicare Integrity Program, the Secretary is authorized to enter into contracts with recovery audit contractors. 42 U.S.C. § 1395ddd. *See also Gentiva Healthcare Corp. v. Sebelius*, 857 F. Supp.2d 1, 3 (D.D.C. 2012), *aff'd*, 723 F.3d 292 (D.C. Cir. 2013) (noting that the Secretary was required to engage contractors to promote the integrity of the Medicare program under the Medicare Integrity Program). In a process referred to as a "post-payment review" of certain healthcare providers, payment decisions made by MACs are commonly audited by Unified Program Integrity Contractors ("UPICs"), one type of recovery auditor contractor that contracts with CMS. 42 C.F.R. § 421.304 *et seq.;* 42 U.S.C. § 1395ddd(b).

31. In their audits, UPICs are statutorily required to identify both overpayments and underpayments. *See, e.g.*, 42 U.S.C. §§ 1395ddd(b) and (h), 1395g(a).

32. Under the Medicare Integrity Program, 42 U.S.C. § 1395ddd(f)(8), the Secretary also is required to establish a "standard methodology for medicare contractors to use in selecting a sample of claims for review in the case of an abnormal billing pattern."

33. Consequently, all CMS auditors contracted under 42 U.S.C. § 1395ddd, including UPICs, are required to use a standard methodology for their post-payment review, which includes a standard methodology for the use of statistical sampling and extrapolation to determine overpayments.

### 1. Statistical Sampling and Extrapolation

34. The use of statistical sampling and extrapolation to estimate an overpayment amount (versus claim-by-claim review) in the Medicare reimbursement post-payment review process was first approved in 1986 by the Health Care Finance Administration ("HCFA"), which was the predecessor to CMS. *See* CMS Ruling 86–1, Use of Statistical Sampling to Project Overpayments to Medicare Providers and Suppliers (Feb. 20, 1986).

35. CMS Ruling 86-1 provides that sampling for extrapolation purposes "only creates a presumption of validity as to the amount of an overpayment which may be used as the basis for recoupment." CMS Ruling 86-1 at 11.

36. Following an overpayment determination based on extrapolation, the burden shifts to the Medicare provider or supplier, who "could attack the statistical validity of the sample, or . . . could challenge the correctness of the determination in specific cases identified by the sample[.]" *Id.*

37. CMS further emphasized that providers and suppliers should and would have a fair opportunity to contest adverse determinations based on statistical sampling: **"Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process."** CMS Ruling 86-1 at 11 (emphasis added).

#### a) Statutory Requirements in Employing Statistical Sampling and Extrapolation

38. In 1996, Congress created the Medicare Integrity Program to strengthen the Secretary's ability to deter fraud and abuse. *See* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104–191, §§ 201–02, 110 Stat. 1936, 1992–98 (codified at 42 U.S.C. §§ 1395i(k)(4), 1395ddd).

39. Since the passage of this law, Congress has continued to refine the requirements Medicare contractors must follow when conducting their post-payment review audits.

40. Specifically, before a Medicare contractor can use statistical sampling and extrapolation to determine overpayment amounts to be covered by recoupment, offset, or otherwise, there must be a determination of a "sustained or high level of payment error; or documented educational intervention has failed to correct the payment error." *See* 42 U.S.C. § 1395ddd(f)(3).

41. Additionally, in December 2006, Congress added a provision requiring that any Medicare contractor tasked with performing recovery audits under the Medicare Integrity Program do so with the purpose of "**identifying underpayments and overpayments** and recouping overpayments under this subchapter with respect to all services for which payment is made under this subchapter." *See* 42 U.S.C. § 1395ddd(h)(1) (emphasis added).

42. "Underpayments" refers to non-payments where applicable law requires payment by CMS to a provider or supplier; or to payments of less than the amount owed by CMS to a provider or supplier according to applicable law. *See, e.g.*, 20 C.F.R. § 416.536.

43. The Improper Payment Reduction Acts also require government auditors to perform their reviews objectively. *See* Pub. L. 116-117 § 2(a); Pub. L. 111-204 §§ 2(a)-(b), (e); Pub. L. 107-300 §§ 2(a)-(b), (d)(2).

44. Since 2002, these Acts have consistently defined "improper payment" to include payments made in an incorrect amount, including both overpayments and underpayments. Pub. L. 116-117, § 2(a); Pub. L. 112-248, §§ 2(2), 3(a)(1); Pub. L. 111-204, § 2(e); Pub. L. 107-300, § 2(d)(2).

45. These Acts, like the other legal authorities cited in this complaint, underscore that

(1) payments of less than the amount owed under a federal requirement are improper and (2) federal agencies must identify and include such underpayments when determining a net overpayment. *See* Pub. L. 116-117 § 2(a); Pub. L. 111-204 §§ 2(a)-(b), (e); Pub. L. 107-300 §§ 2(a)-(b), (d)(2).

**b) Sub-regulatory Guidance for Statistical Sampling and Extrapolation: the Medicare Program Integrity Manual**

46. The congressional mandate that audit contractors examine overpayments and underpayments to determine a net overpayment is incorporated by CMS throughout relevant sub-regulatory guidance for statistical sampling and overpayment estimation detailed in the Medicare Program Integrity Manual ("MPIM").[1]

47. The MPIM's guidelines are provided to "ensure that a probability sample drawn from the sampling frame of the target population yields a valid estimate of an overpayment in the target population." MPIM Ch. 8, § 8.4.1.1.

48. The guidelines further require that "the provider/supplier is treated fairly despite any imprecision in the estimation." MPIM Ch. 8, § 8.4.5.

49. While CMS does not require its contractors to use a particular statistical practice, the methodology must be statistically valid, and providers retain a due process right to challenge its soundness. *Illinois Physicians Union v. Miller,* 675 F.2d 151, 156-57 (7th Cir. 1982) (holding that due process requires notice and a meaningful opportunity to rebut a sampling-based overpayment determination, including challenges to the methodology itself). Moreover, the cumulative effect of several otherwise allowable errors may render a statistical sampling and extrapolation invalid. *See Cent. La. Home Health Care, LLC v. Price*, No. 17-cv-00346, 2018 WL

[1] Unless otherwise noted, citations to the MPIM are to the 2024 version (Pub. 100-08, Transmittal 13008, effective January 1, 2024), which was the version in effect at the time of the audit.

7888523, at *16-20 (W.D. La. Dec. 28, 2018) ("[F]ailure to adhere to several or all of these safeguards should eliminate the presumption that the statistical analysis is valid.").

50. Further, Medicare contractors must preserve and produce supporting documentation of the extrapolation. If they fail to timely provide such documentation, a provider or supplier's due process rights are violated. *MedEnvios Healthcare Inc. v. Becerra*, 725 F. Supp. 3d 1343, 1350-51 (S.D. Fla. 2024); MPIM §§ 8.4.4.4, 8.4.4.4.1.

**C. Medicare Administrative Appeals Process**

51. A Medicare provider or supplier that is dissatisfied with a UPIC's post-payment claim denials and resulting MAC determination of an overpayment may participate in the administrative appeals process. 42 U.S.C. § 1395ff and 42 C.F.R. Subpart I.

**1. Level One: Redetermination**

52. After the initial determination that an overpayment has been made, a denied claim may be submitted to a MAC for redetermination. 42 U.S.C. § 1395ff(a)(3)(A). In the case of a denied claim by a UPIC, the determination is sent back to the MAC for re-review.

53. Upon receipt of the request for redetermination, the MAC has sixty days to issue a decision. *Id.* § 1395ff(a)(3)(C)(ii).

**2. Level Two: Reconsideration**

54. If the redetermination is unfavorable or only partially favorable, the appealing party may submit a request for reconsideration. *Id.* §§ 1395ff(b), (c).

55. A reconsideration is a review of the MAC's redetermination conducted by a qualified independent contractor ("QIC"). *Id.* § 1395ff(c)(3)(B)(i).

56. Upon receipt of the request for reconsideration, the QIC has sixty days to issue a decision. *Id.* § 1395ff(c)(3)(C)(i).

### 3. Level Three: Administrative Law Judge Hearing

57. A party that is dissatisfied with the QIC's reconsideration determination may request a hearing and *de novo* review before an ALJ with OMHA, provided the amount in controversy, which was a minimum of $190 at the time Proactive requested an ALJ hearing in the Calendar Year 2025, is met. *Id.* § 1395ff(b)(1)(E); CMS, Medicare Appeals, Adjustment to the Amount in Controversy Threshold Amounts for Calendar Year 2025, 89 Fed. Reg. 79,294 (Sept. 27, 2024).

58. The purpose of a hearing before an ALJ is to provide important procedural due process protections to an appellant-provider/supplier, including "the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact." *Fam. Rehab., Inc. v. Azar*, 886 F.3d 496, 499 (5th Cir. 2018); 42 C.F.R. § 405.1108; s*ee also Lonzollo v. Weinberger*, 534 F.2d 712, 714 (7th Cir. 1976) (the right to appear before an ALJ encompasses a meaningful opportunity to confront and respond to the evidence on which the ALJ relies).

59. In contrast to federal district courts, the scope of authority for an ALJ is circumscribed. The Supreme Court has found that "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures" and are generally left to federal courts. *Califano v. Sanders*, 430 U.S. 99, 109 (1977).

60. An ALJ may review issues regarding failure to follow existing procedures, and other such issues that had been raised at the redetermination and reconsideration levels of the Medicare claims appeal process. *See* 42 C.F.R. § 405.1032(a).

61. Where a provider or supplier disagrees with how a statistical sample and/or extrapolation was conducted, the provider or supplier must assert the reasons they disagree with

how the statistical sampling and/or extrapolation was conducted in the request for an ALJ hearing. 42 C.F.R. § 405.1014(a)(3).

62. Should the provider or supplier have additional constitutional challenges to statistical sampling and/or extrapolation that were not raised at the lower administrative levels, such claims can be appropriately brought in federal court and are not precluded from judicial review. *See, e.g., Califano*, 430 U.S. at 109.

63. In issuing a decision, ALJs are bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security Act and applicable implementing regulations. CMS Rulings, precedential Council decisions, and National Coverage Determinations ("NCDs") are likewise binding on the ALJ. 42 C.F.R. § 405.1063.

64. ALJs are not bound by Local Coverage Determinations ("LCDs") or CMS program guidance but will give substantial deference to these policies if they are applicable to a particular case. *Id.* § 405.1062(a).

65. An ALJ must consider "all the issues for the claims . . . specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in [the appellant's] favor." *Id.* § 405.1032(a).

66. In conjunction with her or his review and decision, the ALJ has a regulatory duty to build the administrative record. This administrative record must include the originally-appealed decisions, the documents and other evidence used in making those appealed decisions, the ALJ's decision, and all other evidence. *Id.* § 405.1042(a)(2) ("The record will also include any evidence excluded or not considered by the ALJ or attorney adjudicator, including, but not limited to, new evidence submitted by a provider or supplier, or beneficiary represented by a provider or supplier, for which no good cause was established, and duplicative evidence submitted by a party.").

67. Under 42 U.S.C. § 1395ff(d)(1)(A), an ALJ must conduct and conclude the hearing and render a decision no later than 90 days after the request for a hearing was filed. *See also* 42 C.F.R. § 405.1016(a).

**4. Level Four: Medicare Appeals Council Review**

68. The final administrative option for appeal of an unfavorable or partially favorable decision occurs with the Council. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1108(a).

69. A party dissatisfied with an ALJ's decision may request review by the Council, or the Council may decide on its own motion to review an ALJ decision (often after a referral from the Administrative Qualified Independent Contractor ("AdQIC")). 42 C.F.R. §§ 405.1102(a)(1), 405.1110; Medicare Claims Processing Manual, CMS Pub. 100-04, Ch. 29 § 340.1.

70. Under 42 C.F.R. § 405.1100(c), the Council undertakes a *de novo* review and issues a decision, dismissal, or remands the case to the ALJ within 90 days of receipt of the request for Council review.

71. Where the Council issues a decision, that decision will act as the final decision of the Secretary for purposes of 42 U.S.C. § 405(g) and § 1395ff(b)(1)(A) and is final and binding on all parties unless a federal district court issues a decision modifying the Council's decision. 42 C.F.R. § 405.1130.

**5. Level Five: Federal District Court and Escalation**

72. If the Council does not issue a decision, dismissal, or remand within 90 days, the appealing party may file a request to escalate the case to federal district court for judicial review. 42 C.F.R. § 405.1132(a).

73. If the appellant files a request to bypass the Council and escalate the case to a federal district court, the ALJ's decision will act as the final decision of the Secretary based on the

administrative record documents and materials directly or indirectly considered by the ALJ and its Medicare contractor agency decision-makers. 42 C.F.R. § 405.1042(a)(2); *see also Catalyst Pharms., Inc. v. Azar*, No. 19-cv-22425, 2020 WL 4573068, at *3 (S.D. Fla. May 1, 2020).

74. Upon the Council's receipt of the escalation request, the Council has five days to issue a decision, dismissal, remand, or provide notice that it is unable to do so. 42 C.F.R. § 405.1132(a).

75. If, within this five-day window, the Council provides notice that it is unable to issue a decision, dismissal, or remand within the statutory time frame, a party may file an action in Federal district court within 60 days after receiving the Council's notice. 42 C.F.R. § 405.1132(b).

76. Unlike an ALJ or the Council, whose scope of authority is circumscribed, a district court "reviewing an agency determination under § 405(g) has adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide, including, where necessary, the authority to develop an evidentiary record." *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 82 (2d Cir. 2006) (quoting *Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 23–24 (2000)).

77. In a Medicare provider or supplier reimbursement dispute, judicial review of the Secretary's decision is governed by 42 U.S.C. § 405(g), as incorporated into the Medicare Act by 42 U.S.C. § 1395ff(b)(1)(A). Under § 405(g), the Secretary's factual findings, if supported by substantial evidence, are conclusive, and the court reviews whether the agency's decision conforms with applicable law and regulations. *Doctors Nursing & Rehab. Ctr. v. Sebelius*, 613 F.3d 672, 675–76 (7th Cir. 2010); *Wood v. Thompson*, 246 F.3d 1026, 1028–29 (7th Cir. 2001).

78. The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or

"unsupported by substantial evidence." 5 U.S.C. § 706(2); *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 547 (7th Cir. 2012).

79. With respect to the Secretary's factual findings specifically, "[t]he substantial evidence standard of the [APA] is generally used as the standard for review of an agency's factual findings." *Mt. Sinai Hosp. Med. Ctr. v. Shalala,* 196 F.3d 703, 707 (7th Cir. 1999). By contrast, the Secretary's legal conclusions are reviewed *de novo*. *Casey v. Berryhill*, 853 F.3d 322, 326 (7th Cir. 2017).

**D. Due Process Requirements**

80. To demonstrate a procedural due process violation, a plaintiff must show: (1) a cognizable liberty or property interest; and (2) that the administrative procedures provided to the plaintiff violated mandatory procedural safeguards or were otherwise constitutionally inadequate. *Mathews v. Eldridge*, 424 U.S. 319, 332-35 (1976).

81. The Seventh Circuit has expressly recognized that Medicare beneficiaries and their assignees have a property interest that is cognizable under the Due Process Clause. *Rock River,* 14 F.4th at 776.

82. As further detailed below, when agency contractors use statistical sampling and extrapolation to calculate an overpayment, certain procedural safeguards have been put in place (by statute, as well as through regulatory and sub-regulatory guidance) to protect a provider's or supplier's property interest from erroneous deprivation.

**(1) A UPIC Must Provide Meaningful Notice and Sufficient Documentation to Recreate the Statistical Sampling and Extrapolated Overpayment Process**

83. One of the due process procedural safeguards set forth in the MPIM is that an auditor must maintain and provide sufficient documentation so that a provider wishing to challenge the alleged overpayment can recreate each step of the statistical sampling and extrapolation

process. *See* MPIM Ch. 8, § 8.4.1.3 (which outlines the steps for conducting statistical sampling and requires that "[f]or each step, the contractor shall provide complete and clear documentation sufficient to explain the action(s) taken in the step and to replicate, if needed, the statistical sampling"); *see also* § 8.4.4.2 (the contractor "shall document all steps taken in the random selection process exactly as done to ensure that the necessary information is available for anyone attempting to replicate the sample selection"); § 8.4.4.4.1 (requiring that "[a]n explicit statement of how the universe is defined and elements included shall be made and maintained in writing" and "documentation shall be kept in sufficient details so that the sample frame can be re-created should the methodology be challenged").

84. The mandatory steps of the statistical sampling and extrapolation process are set forth in MPIM Ch. 8, § 8.4.1.3.

85. Once a UPIC has selected the provider or supplier to be audited, and the audit period to be reviewed, the auditor then must define the universe, sampling unit, and sampling frame. MPIM Ch. 8, § 8.4.1.3.

86. The target universe "includes all claim lines that meet the selection criteria" and must include all adjudicated claims (to include paid claims, partially paid claims, and adjudicated claims issued a payment of zero—hereinafter "zero-paid claims") to properly account for potential underpayments and overpayments. MPIM Ch. 8, § 8.4.3.2; *Goose Creek Physical Med., LLC v. Becerra*, No. 22-cv-03932, 2024 WL 3992721, at *2 (D.S.C. Aug. 29, 2024) (stating that the statistical sampling and extrapolation process "requires the contractor to accurately assess underpayments as well as overpayments, including claims that were [zero-paid] after adjudication to ensure the actual net overpayment is correctly calculated").

87. The target universe of claims is a static data set that is filtered to create the sampling frame based on the objective of the review. MPIM Ch. 8, § 8.4.3.2; *see also Goose Creek Physical Med., LLC v. Becerra*, No. 22-cv-03932, 2024 WL 942918, at *2 (D.S.C. Mar. 5, 2024) ("For purposes of extrapolation, the 'target universe' of a provider's Medicare claims consists of all claims submitted by the provider within the chosen time period, which typically covers all relevant claims or line items for the period under review").

88. When creating the sampling frame from the target universe, there are mandatory limiting criteria such as the exclusion of "unpaid" claims (which unlike zero-paid claims, are claims that have been submitted for payment but have not yet been adjudicated), and previously reopened claims by other auditors. *Goose Creek*, 2024 WL 942918, at *2 n.2 ("Zero-paid claims, which are claims that were unpaid after adjudication, are distinguishable from unpaid claims, which are claims that have been submitted for payment but have not yet been adjudicated or processed for payment determination.").

89. A comparison of the two data sets, the unfiltered target universe and filtered sampling frame, reveals if the limiting criteria were properly applied; as such, failure to provide the target universe prevents a provider or supplier from recreating the sampling frame, which in turn is necessary to determine the validity of statistical sampling and extrapolated overpayment. *Goose Creek Physical Med., LLC v. Becerra*, No. 2:22-CV-03932-DCN, 2024 WL 3653639, at *10 (D.S.C. Aug. 5, 2024) (agreeing with the plaintiff that the plaintiff could not "recreate the sampling frame and sampling process" without the target universe and therefore could not "verify the [CMS] contractor's calculations to test the statistical validity of the sample and subsequent extrapolation[,]" which led the court to find that the Secretary's failure to preserve and produce the target universe prejudiced the plaintiff throughout the underlying appeals process).

90. Once the universe, sampling unit, and sampling frame are defined, the auditor designs the sampling plan and uses a computer program to generate a random sample from the sampling frame. MPIM Ch. 8, §§ 8.4.1.3; 8.4.4.2.

91. The contractor's medical review staff then reviews each sampled unit to determine whether CMS's original payment determination was correct (or, in statistical terms, to determine the "variable of interest"). The reopening review records the result for each claim or claim line as properly paid, overpaid, underpaid, or improperly denied. *Id.* at § 8.4.1.3; § 8.4.6.3.

92. After the variable of interest (i.e. the accuracy of the CMS adjudication process) is determined, the contractor calculates the net average amount overpaid for the sampled claims by deducting the underpayment amount from the overpayment amount. This net overpayment, determined from the sample set, is then projected to the sampling frame of that provider's claims to form the extrapolated overpayment amount. *Id.* at § 8.4.1.3; § 8.4.5.

93. Failure to provide sufficient documentation to an audited party to recreate the extrapolation, including any subsequent recalculation of the overpayment amount, violates procedural due process. *MedEnvios Healthcare, Inc.*, 725 F. Supp. 3d at 1350-51.

**(2) An Audit Must Be Unbiased and Include Review of Underpayments as Well as Overpayments**

94. A separate procedural safeguard codified in the Medicare Integrity Program statute requires UPICs to identify both overpayments and underpayments to ensure that any assessed extrapolated overpayment is statistically accurate and ensure that the statistical audits are not biased against providers or suppliers. 42 U.S.C. §§ 1395ddd(b) and (h), 1395g(a); 42 C.F.R. § 421.304.

95. This statutory mandate in 42 U.S.C. § 1395ddd(h) is incorporated by CMS into the MPIM to support this due process requirement. *See, e.g.,* MPIM Ch. 8, § 8.4.1.3 (requiring an

auditor to "[e]xamin[e] each of the sampling units and determin[e] if there was an overpayment or an underpayment"); § 8.4.7.1 ("the explanation of the sampling methodology that was followed shall include . . .[t]he amount of the actual overpayment/underpayment from each of the claims reviewed"); § 8.4.6.3 ("[t]he contractor shall document . . . [t]he amount of all overpayments and underpayments and how they were determined.").

96. Moreover, during the medical review process, any "[s]ampling units that are found to be underpayments, in whole [*i.e.,* zero-paid claims] or in part, are recorded as negative overpayments and shall be used in calculating the estimated overpayment." *Id.* § 8.4.5.

97. Since zero-paid claims represent potential underpayments, they must be included in the target universe and sampling frame to ensure that the actual net overpayment is correctly calculated. *Goose Creek*, 2024 WL 942918, at *2 (noting that the sampling and extrapolation process "requires the contractor to accurately assess underpayments as well as overpayments, including claims that were unpaid after adjudication to ensure the actual net overpayment is correctly calculated").

98. Conversely, by excluding zero-paid claims from review, the audit systematically captures only potential provider or supplier errors while excluding claims most likely to reflect Defendant's underpayment errors. The resulting sample is structurally biased and therefore cannot serve as a representative basis for extrapolation.

## IV. STANDARD OF REVIEW AND SCOPE OF AUTHORITY

99. 42 U.S.C. § 405(g) is limited to providing the procedure and standard of review by which a provider can challenge a "final decision" by the Secretary as to the findings of fact made by the agency. *Id.* (providing that the "findings of the [Secretary] as to any fact, if supported by substantial evidence, shall be conclusive); *but see Friedman v. Sebelius*, 686 F.3d 813, 827

(D.C. Cir. 2012) (noting that "section 405(g) … is silent regarding the standard of review except with regard to questions of fact").

100. Where 42 U.S.C. § 405(g) is silent, the APA's default rules for judicial review of agency decisions apply. *See* 5 U.S.C. § 559 (which states that a "[s]ubsequent statute may not be held to supersede or modify … [the APA] … except to the extent that it does so expressly."); *see also Yale-New Haven Hosp.*, 470 F.3d at 78 (stating the court reviews Secretary actions pursuant to the specific provisions of § 405(g), but "where no provision of § 405(g) is on point, we apply the judicial review provisions of the APA."); *Beechwood Restorative Care Center v. Thompson*, 494 F. Supp. 2d 181, 194 (W.D.N.Y. 2007) ("[I]f § 405(g) does not provide a standard of review for a particular claim, the Court may look to other statutes, such as the APA, for guidance."); *Vitreo Retinal Consultants of the Palm Beaches, P.A. v. U.S. Dep't of Health & Human Servs.*, 649 F. App'x 684, 689 (11th Cir. 2016) (noting that 42 U.S.C. § 405(g) supplies the standard by which to review Secretary's findings of fact, but "as for legal conclusions, the [APA]" applies).

101. Where the issue presented on appeal is a question of law, courts apply their own judgment using the APA as the exclusive standard of review. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024) ("[The APA] specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action[.]") (emphasis in original); *see also Vitreo,* 649 F. App'x at 689.

102. Section 706 of the APA provides the relevant standards of review and scope of judicial authority, stating that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

103. Moreover, Section 706(2) mandates that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

104. This mandate includes deciding the meaning of ambiguous laws, and setting aside any agency action inconsistent with the law as the court interprets it. *Loper Bright*, 603 U.S. at 392.

105. "In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.

106. While the court's factual review is usually limited to the administrative record, s*ee Mathews v. Weber*, 423 U.S. 261, 263, 270 (1976), there are exceptions to this general rule, particularly when constitutional or statutory challenges are raised.

107. As the Supreme Court has noted, "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures." *Illinois Council*, 529 U.S. at 23–24 (quoting ***Cent. La.,*** 430 U.S. at 109).

108. Consequently, it is the court "reviewing an agency determination under § 405(g) [that] has adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide … **including, where necessary, the authority to develop an evidentiary record**" for that purpose. *Id*. (emphasis added).

109. In contrast to the deference due to findings of fact under 42 U.S.C. § 405(g), a district court reviews the Secretary's (or in this case, the ALJ's or Council's)

conclusions of law *de novo*, and failure to apply the correct legal standards is grounds for reversal. *Loper Bright*, 603 U.S. at 392 (noting that the APA "prescribes no deferential standard for courts to employ in answering … legal questions"); *Parker for Lamon v. Sullivan,* 891 F.2d 185, 188 (7th Cir. 1989) (noting that the Secretary's legal findings are reviewed de novo).

110. In reviewing a final agency decision in the Medicare appeals context, federal district courts "have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Secretary]. . ." 42 U.S.C. § 405(g). *See also* 5 U.S.C. § 706 (stating the reviewing court shall have the ability to compel, hold unlawful, or set aside agency actions, findings, and conclusions).

111. Federal district courts have broad statutory jurisdiction to grant relief on judicial review of a final agency decision. *See Smith v. Berryhill*, 587 U.S. 471, 487 (2019) (describing courts' "broad grant of authority" under 42 U.S.C. § 405(g)).

112. Courts' broad grant of authority includes the authority to set aside an extrapolated overpayment demand where it is found to be procedurally invalid. *See, e.g.*, *Cent. La. Home Health Care, LLC*, 2018 WL 7888523, at *25; *MedEnvios Healthcare*, 725 F. Supp. 3d at 1350-51.

## V. HIERARCHY OF AUTHORITY

113. "In a case that presents a conflict between the Constitution and a statute" the Supreme Court has given "full effect to the Constitution and to whatever portions of the statute are not repugnant to the Constitution, effectively severing the unconstitutional portion of the statute." *United States v. Arthrex, Inc*., 594 U.S. 1, 24 (2021) (internal quotations omitted).

114. However, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988).

115. Similarly, where there is a conflict between a statute and a regulation, or a statute and CMS guidance manuals, such as the MPIM, the statute will govern. *See Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936) (noting that a regulation operating to create a rule out of harmony with a statute is a "mere nullity").

116. An agency's interpretation of an interpretive manual, such as the MPIM, is not afforded any deference under *Auer*.[2] *Elgin Nursing & Rehab. Ctr. v. Dep't of Health & Human Servs.*, 718 F.3d 488, 494 (5th Cir. 2013) (declining to defer to HHS's interpretation of a provision of the State Operations Manual).

117. The statistical sampling and extrapolation guidelines set out in the MPIM are entitled only to weight commensurate with their power to persuade. *Abraham Lincoln Mem'l Hosp.,* 698 F.3d at 554-55 (recognizing that agency interpretations in "opinion letters, policy statements, agency manuals, and enforcement guidelines" are entitled only to *Skidmore* deference).

## VI. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. UPIC Post-Payment Audit

118. Proactive seeks judicial review of the Secretary's statistical sampling methodology and resultant extrapolated overpayment demand assessed on claims submitted by Proactive for subsequent and initial nursing facility care E/M services, established patient domiciliary or rest home visits and established patient home/residence visits to multiple Medicare beneficiaries, previously paid by Medicare, for the relevant Review Period.

119. On August 29, 2023, CoventBridge Group ("CoventBridge"), the UPIC for the Midwestern Jurisdiction, sent a post-payment request for medical documentation for twelve

---

[2] *Auer v. Robbins*, 519 U.S. 452 (1997).

Medicare beneficiaries for dates of service ("DOS") between October 1, 2022 and August 30, 2023.

120. On January 25, 2024, CoventBridge sent Proactive a letter with its Post-Payment Review Results and Overpayment Determination after reviewing 30 claims for 30 services for potential improper billing of Medicare Part B Nursing facility visit procedure codes 99304, 99305, 99306, 99307, 99308, 99309, and 99310, finding that 23 claims/lines or 76.7% of claim/lines reviewed were not rendered as billed, resulting in an overpayment amount of $1,799.71.

121. On April 26, 2024, CoventBridge sent Proactive another Post Payment Medical Records Request ("2024 Records Request") for medical records for specific Medicare beneficiaries with dates of service from April 17, 2020, through February 5, 2024.

122. CoventBridge alleged that it reopened the claims in accordance with 42 C.F.R. § 405.980, based on the oldest paid date in the sample of May 20, 2020, and requested all medical records and supporting documentation from Proactive to support the billing of the selected sample claims.

123. On May 29, 2024, CoventBridge received the requested medical records from Proactive.

124. On August 20, 2024, CoventBridge sent Proactive its Post-Payment Review Results and Overpayment Determination (the "Findings"), asserting a 77.75% payment error rate based on the medical review of 33 claims/33 claim lines, and an extrapolated overpayment amount of $10,478,721.00.

125. Enclosed with the Findings was a CD that included the following:

1. Medical Review
    a. Extrapolated Overpayment – RS_042224_UMWR263749
        i. SSOE Claim line Spreadsheet Proactive Clinical Partners
        ii. SSOE Claims Extract Proactive Clinical Partners

iii. Citations

2. Statistical Sampling for Overpayment Estimation ("SSOE") Methodology - RS_042224_UMWR263749
   a. SSOE Universe Proactive Clinical Partners
   b. SSOE Sampling Frame Proactive Clinical Partners
   c. SSOE Random Sample Proactive Clinical Partners
   d. SSOE Sampling Plan Document Proactive Clinical Partners
   e. SSOE Overpayment Extrapolation report Proactive Clinical Partners
   f. SSOE Methodology Report Proactive Clinical Partners
   g. SSOE RAT-STATS Sample Size Report Proactive Clinical Partners
   h. SSOE Randomization Proactive Clinical Partners
   i. SSOE Rat-Stats Proactive Clinical Partners
   j. SSOE Histogram of Paid Proactive Clinical Partners

3. Copy of the overpayment letter and all attachments.

126. CoventBridge conducted an SSOE utilizing a Simple Random Sample pulled from a filtered claims data set with dates of service from May 15, 2020, through April 22, 2024 that was retrieved from CMS's integrated data repository ("IDR") on April 22, 2024.

127. CoventBridge prepared an initial overpayment estimation for Proactive based on the following parameters and definitions:

| **Category** | **Detail** |
|---|---|
| Universe DOS Range (used as filter) | 05/15/2020 – 04/22/2024 |
| Universe DOS Range (returned) | 05/15/2020 – 04/03/2024 |
| Sample Type | Simple Random Sample |
| Sample Unit | Claim |
| Universe Limiting Criteria | Paid Claims Only; MSP and RRB Claims Removed; Removed claims from 2 previously reviewed overpayment files; Removed 3 claims previously uploaded to RAC DW |
| Sample Size | 33 |
| Total Universe/Population Size | 239,097 |
| Total Universe Payments | $16,382,600.42 |
| Total Sample Payments | $2,143.78 |
| Total Sample Overpayment Amount | $1,666.70 |
| Point Estimate | $12,075,848.00 |
| 1-Sided 90% Lower Limit | $10,478,721.00 |
| 1-Sided 90% Upper Limit | $13,672,974 |
| Precision Level | 13.23% |

| Category | Detail |
| --- | --- |
| Billing Error Rate | 84.85% |
| Payment Error Rate | 77.75% |

128. Although CoventBridge produced a file entitled "a. SSOE Universe Proactive Clinical Partners.xlsx" that they allege constitutes the relevant "universe," this file did not include the target universe of claims that Proactive submitted for the Review Period.

129. Rather, the SSOE notes that the alleged "universe" was created after applying the following limiting criteria, excluding zero-paid claims, as well as MSP and RRB claims, and claims from 2 previously reviewed overpayment files and 3 claims previously uploaded to RAC DW; however, the unfiltered data set should have been included in the spreadsheet entitled "a. SSOE Universe Proactive Clinical Partners.xlsx."

130. Utilizing this filtering process, CoventBridge created the sampling frame, consisting of 239,097 claims for which Proactive was paid $16,382,600.42, a data set that is identical to the data set alleged to be the "universe."

131. CoventBridge then pulled a random sample of 33 claims, and after a medical review of these claims, asserted a payment error rate of 77.75%, and a point estimate of $12,075,848 with a precision percentage of 13.23%.

132. As statistically required, CoventBridge used the lower bound of the one-sided 90% confidence limit and assessed an estimated overpayment amount of $10,478,721.

**B. Demand Letter**

133. On September 5, 2024, Wisconsin Physicians Service Insurance Corporation ("WPS"), the MAC, sent Proactive an overpayment demand letter requesting repayment of the full extrapolated overpayment of $10,478,721.00 (the "Demand Letter") for alleged Medicare payment errors stemming from claim denials determined by CoventBridge.

134. The Demand Letter stated that simple interest at the rate of 11.875 percent will be charged monthly on the unpaid balance of the overpayment.

**C. Level One: Redetermination Request**

135. On October 3, 2024, Proactive timely submitted an MMA 935 Overpayment Appeal for Redetermination to WPS (the "Redetermination Request").

136. In the Redetermination Request, Proactive challenged the extrapolated overpayment in the Demand Letter, including the validity of the statistical sampling and methodology, and each of the denied individual claims.

137. In the Redetermination Request, Proactive challenged the statistical extrapolation methodology on several grounds, including: (a) that the extrapolation was fundamentally flawed because statistical sampling cannot be used to estimate liability when such a determination is based on medical necessity, as statistical sampling is not a substitute for expert medical judgment; (b) that the universe of claims improperly excluded claims submitted by Proactive during the Review Period that were adjudicated but not paid; and (c) the sample size of 33 claims was too small relative to the universe of over 239,000 claims.

138. On December 5, 2024, WPS issued a fully unfavorable Redetermination Decision ("Redetermination Decision") on each individual claim and affirmed that the statistical methodology used by the UPIC was valid.

139. The Redetermination Decision did not address the fact that Proactive was not provided with the legally required information regarding the statistical sampling and methodology used to determine the $10,478,721.00 overpayment prior to Proactive's appeal of the Demand Letter.

**D. Level Two: Reconsideration**

140. On February 7, 2025, Proactive timely submitted an MMA 935 Overpayment Appeal for Reconsideration (the "Reconsideration Request") to C2C Innovative Solutions, Inc. ("C2C"), the QIC for Part B North.

141. In the Reconsideration Request, Proactive argued that the statistical extrapolation performed by CoventBridge was flawed because the UPIC excluded adjudicated unpaid claims from the universe, the sample size of 33 claims was too small relative to the universe of over 239,000 claims, and the methodology did not meet statistical requirements or principles of fairness.

142. Proactive retained Dr. Cornelia Dorfschmid, PhD, MSIS, PMP, CHC, of Strategic Management Services, LLC, to serve as a statistical expert.

143. Dr. Dorfschmid provided a report dated February 6, 2025 ("Expert Report"), challenging the validity of the UPIC's statistical sampling and extrapolation methodology, which was submitted with the Reconsideration Request.

144. On February 13, 2025, C2C received the Reconsideration Request.

145. On April 23, 2025, C2C issued a partially favorable Medicare Reconsideration Decision (the "Reconsideration Decision") on a number of individual claims, reversing or reducing certain claim denials and stating that Medicare would make partial payment.

146. It further stated that the MAC is responsible for processing this determination in accordance with standard Medicare methodologies and that the MAC will issue a demand letter containing information regarding the collection process, interest accrual, and requesting an extended repayment schedule.

147. In the Reconsideration Decision, C2C stated it reviewed the documents and engaged in a replication of the sample and overpayment amount and found that the UPIC defined a valid sample and the estimated overpayment is reasonable.

**E. Post-Reconsideration Demand**

148. On May 20, 2025, WPS issued a Revised Demand Letter to Proactive (the "Revised Demand Letter") in reference to the partially favorable Reconsideration.

149. The Revised Demand Letter stated that the balance of the principal amount was now $3,283,440.81 and the interest amount due was $194,001.64, for a total amount due of $3,477,442.45.

150. On June 4, 2025, Proactive sent a letter to WPS (the "June 4 Letter") disputing the amount stated in the Revised Demand Letter. In the June 4 Letter, Proactive noted that the Revised Demand Letter did not indicate whether the stated amount took into consideration the approximately $1.4 million that had already been recouped from Proactive prior to the issuance of the Reconsideration Decision.

151. The June 4 Letter further requested supporting documentation for the updated extrapolation performed to calculate the amount due pursuant to the partially favorable Reconsideration Decision.

**F. Level Three: ALJ Hearing**

**1. ALJ Hearing Request**

152. Proactive timely filed its Request for an ALJ Hearing, appealing C2C's Reconsideration Decision, which was assigned OMHA Appeal No. 3-15079551337.

153. The case was assigned to ALJ Robert B. Preston III in OMHA's Cleveland Field Office.

**2. Prehearing Conference**

154. On August 5, 2025, ALJ Preston conducted the first prehearing conference by telephone.

155. A Prehearing Order was issued following the August 5, 2025, conference. At the prehearing conference, Proactive indicated that it believed the administrative record was deficient regarding the statistical sampling methodology and/or the universe of claims and how the methodology was applied by the UPIC.

156. On August 14, 2025, ALJ Preston's staff submitted a Request for Information ("RFI") to the QIC seeking:

- A complete sample review worksheet showing, for each of the 33 sampled claims, the code, allowed amount, final overpayment determination, and any revisions; and
- The RAT-STATS input file used to perform the post-reconsideration extrapolation, containing the universe data, sample data, and the overpayment values assigned to each claim.

157. On September 5, 2025, the QIC responded to the RFI. However, the response was wholly inadequate. The QIC produced only:

- A single RAT-STATS output table reflecting a May 26, 2025 extrapolation with a reduced lower-limit estimate of approximately $4.67 million, and
- Hundreds of pages of unlabeled, blurred, and disorganized PDFs, many missing headers and context, and none constituting a usable sample review sheet or RAT-STATS input file.

158. The QIC did not produce the Excel file referenced in the RAT-STATS output ("RX_051225_UMWR274345.Ratstatsample.xls"), even though the existence of that file is expressly acknowledged in the SSOE. Nor did the QIC supply any documentation showing which claims were treated as "non-zero errors" in the re-extrapolation or how the QIC's revised claim-level determinations translated into the values used in RAT-STATS.

**3. ALJ Hearing**

159. The ALJ hearing was held by telephone on December 1, 2025.

160. Witnesses appearing on behalf of Proactive included: Dr. Cornelia Dorfschmid, PhD, as statistical expert; Hector Vazquez, Interim Chief Operating Officer; Dr. Ana Maria Faget, MD, Compliance Officer; and Jacob Swalzwelder, Certified Professional Coder and Auditor.

161. The appropriate Medicare contractors were given written notice of the hearing and chose not to attend. All parties testified under oath.

162. At the hearing and through its statistical expert, Proactive made several arguments seeking to invalidate the UPIC's post-payment statistical sample and void the extrapolated overpayment, including: (a) that the sample size of 33 claims was too small and the UPIC did not abide by its own policy regarding precision, because the UPIC used claim payment amounts rather than overpayment amounts to estimate the sample size; (b) that the materials provided by the UPIC did not include the recomputed overpayment estimate following the QIC's partially favorable determinations as required by MPIM § 8.4.9.2, and were provided in a format unusable for replication; and (c) that statistical sampling cannot be used to determine medical necessity, particularly where subjective clinical judgment is involved.

163. Proactive submitted a post-hearing brief dated December 10, 2025, which was admitted into evidence with the permission of ALJ Preston.

164. In the post-hearing brief, Proactive argued that: (a) WPS's failure to issue a revised estimation of the overpayment after the Reconsideration Decision overturned multiple claims violated MPIM § 8.4.9.2; (b) WPS failed to produce the statistical inputs required to validate or replicate the extrapolation, rendering the overpayment unsupported by substantial evidence; and (c) any recovery should be limited to the sustained claim-level overpayments actually established in the administrative record.

**4. ALJ Decision**

165. On March 24, 2026, ALJ Preston issued a fully unfavorable ALJ Decision (OMHA Appeal No. 3-15079551337) (the "ALJ Decision"). A redacted copy[3] of the Decision is attached as **Exhibit 1**.

166. ALJ Preston upheld the UPIC's statistical sampling and extrapolation methodologies as valid, finding that the sampling at issue resulted in a probability sample as defined by MPIM Chapter 8, § 8.4.2 and finding that the Appellant had not met its burden of proving that the statistical sample and extrapolation were invalid under HCFA Ruling 86-1. **Exhibit 1**, pp. 3-8.

167. In the ALJ Decision, ALJ Preston found that:

> [A] preponderance of the evidence indicates that the statistical sampling and extrapolation at issue was conducted in accordance with CMS policy. The MPIM requires that a Medicare contractor follow eight steps in conducting a statistical sample for overpayment estimation…Medicare Program Integrity Manual (MPIM), pub. 100-08, ch. 8, § 8.4.1.3 (Effective May 2023).

**Exhibit 1,** p. 4.

168. ALJ Preston rejected Proactive's arguments that the sampling process and the extrapolated overpayment are invalid, noting that the MPIM is not violated by the sample size at issue or the failure of the UPIC to follow its own internal policies or guidance. **Exhibit 1,** p. 5.

169. The ALJ Decision further found that based on the sampling and extrapolation documentation contained within the administrative record:

> …that the sampling at issue resulted in a probability sample, as defined by MPIM, ch. 8, § 8.4.2. Specifically, the UPIC's documentation demonstrates that it defined the universe, the frame, the sampling units, used proper randomization, accurately measured the variables of interest, and used the correct formulas for estimation. In short, it complied with all pertinent MPIM provisions. Accordingly, I conclude that

[3] A redacted copy is attached removing all Protected Health Information ("PHI") and information about the individual claims which are not at issue in this appeal. An unredacted copy will be included in the Administrative Record.

> the evidence of record gives rise to the presumption that the projected overpayment is valid in accordance with HCFA Ruling 86-1.

**Exhibit 1,** p. 8.

**5. April 24, 2026 Revised Overpayment Demand Letter**

170. On April 24, 2026, WPS issued a letter to Proactive in reference to the ALJ's unfavorable decision for the overpayment amount of $10,478,721.00 (the "Second Revised Demand Letter") stating that "[a]ccording to their records the revised overpayment amount is $4,673,057.00 due to the partially favorable Reconsideration Decision." The letter further stated that the balance of the principal amount is $2,954,709.64 and the interest amount is $0.00. No other documentation about how the revised overpayment demand was calculated was included with this letter.

171. On May 7, 2026, Proactive filed a Rebuttal with WPS regarding the Second Revised Demand Letter.

172. Also on May 7, 2026, Proactive wrote a letter to WPS and requested an accounting spreadsheet detailing the overpayment demands and outstanding debt reflected in the Revised Demand Letter and the Second Revised Demand Letter.

173. On May 22, 2026, WPS responded, claiming Proactive failed to provide a valid reason as to why the recoupment of the overpayment should not continue. WPS did include a spreadsheet outlining the principal and interest payments calculated but did not provide any additional supporting documentation as to how the calculations were made.

**G. Level Four: Medicare Appeals Council Review**

174. On May 21, 2026, Proactive timely filed its Council Review Request ("Council Request") with the Council requesting review of the fully unfavorable ALJ Decision, which was assigned a docket number of M-26-3568.

175. The Council had 90 calendar days to issue a decision, dismissal, or remand following receipt of the Council Request, which would have been August 19, 2026.

**H. Level Five: Escalation to Federal District Court**

176. On August 20, 2026, Proactive filed a letter with the Council requesting escalation to federal district court if the Council was unable to timely issue a decision.

177. The Council did not respond to Proactive's request to escalate within the allotted time frame of five (5) days.

178. On August 26, 2026, Proactive filed another letter notifying the Council that it will be escalating this matter to federal court no later than October 19, 2026 in accordance with 42 C.F.R. § 405.1132(a).

## VII. CAUSES OF ACTION

**A. Count One: CoventBridge's Failure to Include Zero-Paid Claims in its Statistical Sampling Violated Plaintiff's Right to Due Process (5 U.S.C. § 706(2)(B) & (D); U.S. Const. Amends. 5, 14.)**

179. Proactive incorporates by reference the preceding paragraphs of this Complaint.

180. Under 5 U.S.C. § 706(2)(B) and (D) of the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . (B) contrary to constitutional right, power, privilege, or immunity [or] (D) without observance of procedure required by law[.]"

181. The Secretary's decision to uphold CoventBridge's extrapolated overpayment was not in accordance with applicable law and warrants *de novo* review.

182. Plaintiff has a valid property interest in receiving Medicare payments for services rendered and its own money taken in the extrapolated portion of the demand and interest assessed.

183. During the Review Period, Proactive submitted claims to Medicare that were adjudicated and resulted in a payment of $0. These zero-paid claims met the definition of the

sampling unit, were adjudicated within the Review Period, and should have been included in the sampling frame.

184. CoventBridge violated Proactive's constitutional due process rights by excluding zero-paid claims meeting the definition of the sampling unit from the sampling frame. Federal statute requires that contractors conducting statistical sampling identify both "underpayments and overpayments." 42 U.S.C. § 1395ddd(h)(1). The MPIM requires that sampling units be examined to determine "if there was an overpayment or an underpayment." MPIM § 8.4.5. By excluding zero-paid claims from the sampling frame, CoventBridge violated these requirements.

185. The exclusion of zero-paid claims from the sampling frame produced a structurally biased estimate. By systematically removing this entire category of claims from the sampling frame, CoventBridge designed an audit structurally incapable of estimating a true net overpayment. The audit captures potential overpayments while eliminating a primary source of underpayments. Regardless of whether CMS made overpayment and underpayment errors at similar rates, the sampling design inherently and predictably overstates the net overpayment.

186. Due process requires that an extrapolated overpayment demand be derived from an unbiased, representative sample capable of identifying both overpayments and underpayments. A sample that is structurally incapable of capturing net error cannot provide the basis for a constitutionally adequate deprivation of Proactive's property.

187. The ALJ's failure to grant relief on this basis was clearly erroneous. The Secretary's final decision affirming an extrapolated overpayment demand derived from a biased, non-representative sample is arbitrary, capricious, contrary to Proactive's constitutional due process rights, and not in accordance with the law. 5 U.S.C. § 706(2)(A), (B), (D).

188. The exclusion of zero-paid claims from the sampling frame independently warrants invalidation of the statistical sampling and extrapolation, and Proactive is entitled to an order vacating the extrapolated overpayment amount calculated on this flawed basis.

**B. Count Two: CoventBridge's Failure to Include Zero-Paid Claims in its Statistical Sampling Violated the Medicare Integrity Program Statute (5 U.S.C. § 706(2)(A) & (C); 42 U.S.C. § 1395ddd)**

189. Proactive incorporates by reference the preceding paragraphs of this Complaint.

190. Under 5 U.S.C. § 706(2)(A) and (C) of the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

191. The Secretary's decision to uphold CoventBridge's extrapolated overpayment was not in accordance with applicable law and warrants *de novo* review.

192. The Medicare Integrity Program statute expressly requires that Medicare audit contractors identify both overpayments and underpayments when conducting post-payment statistical reviews. *See* 42 U.S.C. § 1395ddd(h)(1). This mandate reflects Congress's intent that post-payment audits measure actual net payment error across the full population of adjudicated claims, not merely errors made by the provider.

193. CoventBridge, as the UPIC conducting the post-payment review of Proactive, excluded all adjudicated claims for which Medicare made a payment determination resulting in a payment of $0, *i.e.,* all zero-paid claims, from the sampling frame used to conduct its statistical audit.

194. Because the sampling frame excluded zero-paid claims, CoventBridge's audit measured only payment errors by Proactive. It did not identify claims that CMS may have incorrectly adjudicated at $0 and therefore could not calculate the net payment error. As a result,

regardless of the actual error rates on either side, the extrapolated overpayment demand would systematically overstate the true net payment.

195. The Secretary, through CMS and through each level of administrative review, affirmed and adopted CoventBridge's sampling methodology, including the exclusion of zero-paid claims from the sampling frame. By affirming a sampling methodology that violates the statutory mandate of 42 U.S.C. § 1395ddd to identify underpayments and overpayments, the Secretary's final agency action is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority, and must be set aside pursuant to 5 U.S.C. § 706(2)(A) and (C).

196. The extrapolated overpayment demand resulting from this unlawful sampling methodology, including the Second Revised Demand and any demand for recoupment based thereon, must be vacated.

### C. Count Three: The Secretary and His Agents' Failure to Produce the Target Universe of Claims Violated Plaintiff's Right to Due Process. (5 U.S.C. § 706(2)(B) & (D); U.S. Const. Amends. 5, 14.)

197. Proactive incorporates by reference the preceding paragraphs of this Complaint.

198. Under 5 U.S.C. § 706(2)(B) and (D) of the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . (B) contrary to constitutional right, power, privilege, or immunity [or] (D) without observance of procedure required by law[.]"

199. The Secretary's decision to uphold CoventBridge's extrapolated overpayment was not in accordance with applicable law and warrants *de novo* review.

200. Plaintiff has a valid property interest in receiving Medicare payments for services rendered and its own money taken in the extrapolated portion of the demand and interest assessed.

201. CMS Ruling 86-1 guarantees providers "a full opportunity to demonstrate the invalidity of the statistical sampling methodology" and confirms that a provider has the right to "attack the statistical validity of the sample."

202. Further, MPIM requires that documentation of the statistical sampling be maintained "in sufficient detail so that the sample frame can be re-created should the methodology be challenged." MPIM § 8.4.4.4.1.

203. To assess the validity of the extrapolation, providers must have meaningful access to the foundational data necessary to recreate statistical sampling methodology.

204. Specifically, the provider must have access to the unfiltered target universe from which the sampling frame was drawn to verify each step of the sampling and filtering process was performed correctly.

205. CoventBridge failed to preserve and produce the target universe. What CoventBridge produced and labeled as a "Universe" file was in fact only the claim-line detail of the already-filtered sampling frame, a dataset that reflected CoventBridge's application of its exclusion criteria, not the unfiltered universe of all adjudicated claims from the Review Period meeting the definition of the sampling unit.

206. Proactive has never received the unfiltered target universe. Without it, Proactive cannot verify whether claims were improperly excluded or included, confirm that exclusion criteria were correctly applied, recreate the sampling frame, or confirm that the extrapolation constitutes a valid estimate of an overpayment in the target population. This deprivation violates Proactive's right to be heard "at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333.

207. The ALJ's failure to grant relief on this basis was clearly erroneous. The Secretary's final decision affirming the extrapolated overpayment without remedying CoventBridge's failure

to produce the target universe is arbitrary, capricious, contrary to Proactive's constitutional due process rights, and not in accordance with the law. 5 U.S.C. § 706(2)(A), (B), (D).

208. Proactive is entitled to an order from this Court reversing the Secretary's final decision, invalidating the extrapolated overpayment demand on this independent basis, and entering a declaratory judgment that Defendant violated Plaintiff's due process rights.

### D. Count Four: WPS's Failure to Provide Documentation to Support the Recalculated Demand Violated Plaintiff's Right to Due Process. (5 U.S.C. § 706(2)(B) & (D); U.S. Const. Amends. 5, 14.)

209. Proactive incorporates by reference the preceding paragraphs of this Complaint.

210. The APA requires a reviewing court to hold unlawful and set aside agency action found to be contrary to constitutional right or without observance of procedure required by law. 5 U.S.C. § 706(2)(B), (D).

211. The Fifth Amendment prohibits the federal government from depriving any person of property without due process of law. Proactive has a cognizable property interest in its Medicare reimbursements and in the right to receive documentation sufficient to verify and challenge any demand asserted against it.

212. A meaningful opportunity to be heard requires, at minimum, that Proactive receive the documentation underlying the government's claim against it, including the documentation supporting any recalculated demand.

213. When a MAC issues a revised or recalculated extrapolated overpayment demand, the provider must receive sufficient documentation to independently verify the recalculation, confirm that favorable decisions on individual sample claims were properly credited, and identify the statistical work underlying any new projected overpayment. If the government withholds that documentation, the provider's right to appeal the demand is illusory. *See MedEnvios Healthcare, Inc. v. Becerra*, 725 F. Supp. 3d at 1350-51; MPIM Ch. 8, §§ 8.4.4.4, 8.4.4.4.1.

214. The MPIM independently imposes these documentation obligations. MPIM § 8.4.1.3 requires that "[f]or each step, the contractor shall provide complete and clear documentation sufficient to explain the action(s) taken in the step and to replicate, if needed, the statistical sampling." MPIM § 8.4.4.2 requires the contractor to "document all steps taken in the random selection" of the sample. MPIM §§ 8.4.4.4 and 8.4.4.4.1 impose parallel documentation requirements for the extrapolation itself. These provisions exist precisely so that a provider challenging an extrapolated demand can recreate each step of the sampling and extrapolation process.

215. Following the issuance of CoventBridge's original Demand, and during the pendency of Proactive's administrative appeals, WPS issued a Revised Demand on or after May 20, 2025, reducing the extrapolated overpayment. WPS issued the Revised Demand without providing Proactive with any documentation explaining how the new amount was calculated, which claims were affected, or what statistical work was performed to arrive at the revised figure.

216. On April 24, 2026, WPS issued the Second Revised Demand to Proactive, revising the overpayment amount "due to the partially favorable Reconsideration Decision." The Second Revised Demand stated the balance and interest amounts outstanding and did not include any documentation about how the revised overpayment demand was calculated.

217. On May 7, 2026, Proactive formally submitted a Request for Accounting to WPS seeking the documentation and supporting analysis underlying the Second Revised Demand. On the same date, Proactive filed a Rebuttal to the Second Revised Demand challenging the recalculated amount.

218. On May 22, 2026, WPS responded, claiming Proactive failed to provide a valid reason as to why the recoupment of the overpayment should not continue. With this response, WPS

included a spreadsheet indicating the principal and interest payments that were outstanding. However, WPS did not provide any additional documentation to support how those calculations were made. WPS failed to produce all of the information necessary for Proactive to independently verify the recalculated demand or to meaningfully challenge it through the Council appeal.

219. Under the *Mathews* balancing framework, 424 U.S. 319 (1976), the risk of erroneous deprivation from WPS's documentation withholding is high and unremedied by available safeguards. The mathematical accuracy of any recalculated demand cannot be verified without the underlying recalculation worksheets and statistical documentation, and the government's countervailing interest in withholding that work is minimal. Production of its own recalculation materials costs the government nothing and serves the fundamental purpose of the administrative appeals process: ensuring the amount demanded from the provider is correct.

220. The Secretary, by affirming the demands and adopting the methodology of WPS and CoventBridge at each level of administrative review without requiring the production of supporting recalculation documentation, acted contrary to Proactive's constitutional right to due process, in violation of 5 U.S.C. § 706(2)(B), and without observance of the procedures required by 42 U.S.C. § 1395ff(b) and MPIM §§ 8.4.1.3, 8.4.4.2, 8.4.4.4, and 8.4.4.4.1, in violation of 5 U.S.C. § 706(2)(D).

221. The Second Revised Demand, and any recoupment or payment suspension based thereon, must be set aside as Proactive was denied the complete documentation supporting the recalculated demands and thus lacked a meaningful opportunity to challenge the recalculated amounts.

**E. Count Five: WPS's Failure to Provide Documentation Supporting an Accounting of the Overpayment Demands, Outstanding Debt, and Full Amount Already Recouped Violates Plaintiff's Right to Due Process. (5 U.S.C. § 706(2)(B) & (D); U.S. Const. Amends. 5, 14.)**

222. Proactive incorporates by reference the preceding paragraphs of this Complaint.

223. Proactive has a valid property interest in its Medicare reimbursements and in accurate information about the status of its alleged overpayment debt—a property interest the Fifth Amendment protects against deprivation without due process. That interest cannot be extinguished through a process that withholds from Proactive the information necessary to understand and challenge the government's demands.

224. WPS, acting as the MAC for the claims at issue, issued the original extrapolated overpayment demand against Plaintiff, initiated recoupment of Medicare payments otherwise owed to Plaintiff, and subsequently issued a Revised Demand and a Second Revised Demand. WPS has not provided sufficient documentation explaining how the demands were recalculated, what amounts have been collected, or what remains outstanding.

225. WPS bears a mandatory obligation under governing Medicare statutes, regulations, and MPIM guidance to produce a complete and accurate accounting of all overpayment demands, amounts recouped, outstanding balances, and accrued interest. MPIM §§ 8.4.7.1 and 8.4.6.3 require each demand letter to include information about the review and statistical sampling methodology followed and a claim-by-claim accounting of all overpayments and underpayments determined. MPIM §§ 8.4.4.4 and 8.4.4.4.1 require that when a demand is recalculated, the contractor maintain complete documentation of the sampling methodology—specifically, "in sufficient detail so that the sample frame can be re-created should the methodology be challenged."

226. Federal courts have confirmed that a MAC's accounting obligations extend to the full picture of debts and credits associated with any overpayment demand and the amounts

collected thereon. "It is inexcusable that the Secretary would allow [a MAC] to wield the sovereign authority of the United States to seize money from a private company but then be utterly unable to give an accounting for the amount pillaged." *D&G Holdings, LLC v. Azar*, 776 F. App'x 845, 848 (5th Cir. 2019).

227. When it issued its Revised Demand and Second Revised Demand letters, WPS failed to provide Plaintiff with any accounting of:

a. The total amount of Medicare payments withheld, suspended, or recouped from Plaintiff in connection with the original demand and each successive revised demand;

b. The current outstanding principal balance of the alleged overpayment debt, net of all amounts already collected;

c. The statistical methodology and sample-claim determinations underlying the Revised Demand and the Second Revised Demand, including documentation of how each revised figure was calculated;

d. Any interest that has accrued or is owed by either party under 42 C.F.R. § 405.378; and

e. The amount Plaintiff has already satisfied toward each version of the demand, whether through direct payment, recoupment offset, or suspension of otherwise payable Medicare funds.

228. On May 7, 2026, Plaintiff formally submitted a Request for Accounting to WPS, requesting a complete accounting of all amounts demanded, withheld, recouped, outstanding, and subject to interest.

229. In response to Proactive's request, WPS provided a spreadsheet summarizing the principal and interest payments calculated but did not provide a claim-by-claim accounting of all overpayments and underpayments determined or any additional supporting documentation.

230. The documentation and accounting Plaintiff requested can only be provided by WPS or CMS, as these are the only entities that possess documentation regarding the total amounts demanded and collected from Plaintiff's ongoing Medicare payments.

231. WPS's failure to produce the requested accounting is not a mere procedural deficiency. Without knowledge of what WPS has already collected, what remains outstanding, and how each revised demand was calculated, Plaintiff is unable to determine: (1) whether the government's current overpayment figure is accurate; (2) whether Plaintiff has already been compelled to pay more than is lawfully owed; or (3) whether the government owes Plaintiff a refund and statutory interest.

232. A failure to supply a provider with sufficient documentation to verify and challenge the overpayment calculation "effectively deprives the provider of its right to challenge the statistical validity of the sample and thus may constitute a ground for invalidating the overpayment extrapolation." *LivinRite v. Azar*, 386 F. Supp. 3d 644, 654 (E.D. Va. 2019). The same principle applies with equal force to WPS's refusal to account for what it has already collected: a provider cannot effectively challenge the amount recouped if the MAC withholds the information necessary to assess that amount.

233. WPS's refusal and/or failure to provide a meaningful and timely accounting of Plaintiff's overpayment demands, recouped amounts, outstanding debt, and accrued interest is contrary to Proactive's constitutional rights in violation of 5 U.S.C. § 706(2)(B), as it deprives Proactive of its Fifth Amendment due process right to a meaningful opportunity to be heard on the

amount of its alleged Medicare debt and to challenge the government's collection of those funds; is without observance of procedures required by law in violation of 5 U.S.C. § 706(2)(D), including the mandatory documentation and accounting obligations set forth in MPIM §§ 8.4.4.4, 8.4.4.4.1, 8.4.6.3, and 8.4.7.1; and violates Plaintiff's statutory protections against improper recoupment under 42 U.S.C. § 1395ddd(f)(2) by rendering Plaintiff unable to determine whether WPS's recoupment is lawful and accurately calculated.

234. Plaintiff is entitled to an order setting aside WPS's unlawful withholding of the requested accounting information; requiring WPS and/or CMS to provide a full, verified accounting of all amounts demanded, collected, outstanding, and subject to interest with respect to the claims at issue; and directing a suspension of any ongoing recoupment pending provision of that accounting.

## VIII. PRAYER FOR RELIEF

235. For these reasons, Plaintiff prays for judgment against Defendant for the following:

### A. Count One.

236. An order from this Court invalidating the extrapolated portion of the alleged debt.

237. A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

### B. Count Two.

238. An order from this Court invalidating the extrapolated portion of the alleged debt.

239. A declaratory judgment that Defendant has violated the statutory requirements of the Medicare Integrity Program.

### C. Count Three.

240. An order from this Court invalidating the extrapolated portion of the alleged debt.

241. A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**D. Count Four.**

242. An order from this Court setting aside the Revised Demand and the Second Revised Demand, and suspending any ongoing recoupment based thereon, until Defendant provides Plaintiff with complete documentation supporting the recalculated overpayment amounts.

243. A declaratory judgment that Defendant has violated Plaintiff's Due Process rights by failing to provide documentation sufficient to allow Plaintiff to verify and challenge the recalculated demands.

**E. Count Five.**

244. An order from this Court requiring WPS and/or CMS to provide a full, verified accounting of all amounts demanded, withheld, recouped, outstanding, and subject to interest with respect to the claims at issue.

245. An order from this Court directing suspension of any ongoing recoupment pending provision of that accounting.

246. A declaratory judgment that Defendant has violated Plaintiff's Due Process rights by failing to provide a complete accounting of the overpayment demands, amounts recouped, outstanding debt, and accrued interest.

**F. Additional Relief Requested.**

247. The principal paid and interest on the amounts recouped (i.e., 935 interest); or

248. The principal paid and interest on the amount of principal unpaid to provider within 30 days, at whatever rate is then-existing at the time of the decision, in accordance with 42 C.F.R. § 405.378(d), which entitles Plaintiff to interest from CMS due to the delay in the administrative appeals process.

249. Reasonable attorneys' fees and costs of suit available under 28 U.S.C. § 2412; and

250. Such other and further relief as the Court may deem just and proper under law.

Dated: September 17, 2026

Respectfully Submitted,

**POLSINELLI PC**

By: */s/ Joseph Delehanty*
Joseph Delehanty (IN #3127549)
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Telephone: 312-819-1900
Facsimile: 312-819-1910
jdelehanty@polsinelli.com

Stephen D. Bittinger (*pro hac vice forthcoming*)
Mattie Bowden (*pro hac vice forthcoming*)
177 Meeting Street, Suite 400
Charleston, SC 29401
Telephone: 440.823.0664
sbittinger@polsinelli.com
mbowden@polsinelli.com

*Counsel for Plaintiff*